MATTER OF C—Y—L—

In DEPORTATION Proceedings

A-10672544

*Decided by Board May 23, 1961*

Evidence—Blood tests—Incompatibility of blood overcomes effect of prior admission as United States citizen.

Blood grouping tests which establish the incompatibility of blood between a claimant to citizenship and his alleged parents constitute clear, unequivocal, and convincing evidence that warrants disregard of prior decisions admitting claimant as a United States citizen.

CHARGES:

Order: Act of 1952—Section 241(a)(1) [8 U.S.C. 1251(a)(1)]—Excludable at time of entry—Immigrant, not in possession of a valid immigration visa under section 13(a) of the Immigration Act of May 26, 1924.

Act of 1952—Section 241(a)(2) [8 U.S.C. 1251(a)(2)]—Entered without inspection.

BEFORE THE BOARD

**DISCUSSION:** Respondent, 23 years of age, single, male, a native of China, was admitted to the United States on December 14, 1947, as a United States citizen. He was accompanied by L—G—S, the alleged father, and by L—S—H—C, the alleged mother. The special inquiry officer found, as the result of blood tests conducted in Seattle and in Chicago, that respondent is not the son of the alleged parents and is not, therefore, a United States citizen. He ordered respondent deported on the charges set forth above. Respondent appeals to this Board.

Following his application for a certificate of citizenship under section 341 of the Immigration and Nationality Act, and at the request of the Immigration and Naturalization Service, respondent and his alleged parents cooperated in the performance of blood-grouping tests. On December 17, 1956, respondent's alleged parents went to the King County Central Blood Bank, Inc., Seattle, Washington, where they gave blood in accordance with standard blood-testing procedures. On February 18, 1957, respondent gave blood for the same purpose in Chicago, Illinois, for tests supervised by Dr. Benjamin Neiman, pathologist.

286

The respondent and his alleged parents again cooperated in the performance of blood tests in 1960, under the supervision of the same pathologists and at the same laboratories. The certifications as to the test results from Seattle are signed by Dr. Frederick Kratz. This same pathologist testified as an expert in blood testing and classification in our unreported decision in *Matter of W— K—S—*, A-8895043, sustained in *Wong Kwok Sui v. Boyd*, 285 F.2d 572 (C.A. 9, 1960).

The results of the tests performed at both laboratories on the second occasion are identical with the results of the first tests. Both sets of tests showed that the alleged father falls in blood group O, and the alleged mother falls in blood group A, whereas the respondent is in blood group B. The expert testimony is uniform that an O and A mating cannot produce a B child. The B factor has to be inherited from one of the parents; it is passed in the genes from a parent, and it does not occur as an accident.

The blood tests showed further that the alleged father is type M, the alleged mother is type M, and the respondent is MN. Medical evidence is consistent and uniform that an M and M mating cannot produce an MN child. The N factor must have come from one parent.

During the course of these proceedings a number of statements were taken from the alleged parents, from respondent, and from his alleged godmother in Chicago. The parties were informed that the blood-grouping tests show that there is no possibility of the claimed relationship between respondent and the alleged parents. The parties have continued to assert the claimed relationship.

The special inquiry officer set forth in detail the results of the blood tests, the laboratory techniques employed, and the expert testimony on which he based his finding that respondent is not the son of the alleged parents. Dr. Neiman's qualifications as an expert in this field were conceded. He testified that the tests were made in his laboratory by two technicians working independently with different sera. Since two sets of tests were conducted each time, each test really was performed four times, with identical results each time.

Counsel pleads that there could still have been mistakes in the laboratory procedure by which the blood samples were taken, identified, preserved and tested. We have examined the entire record with care and have concluded that the tests were performed according to standard, accepted laboratory techniques. In *Matter of D— W—O— and D—W—H—*, 5-351 (*United States ex rel. Dong Wing Ott and Dong Wing Han v. Shaughnessy*, 220 F.2d 537; 245 F.2d 875; reaffirmed 247 F.2d 769 (C.A. 2, 1955-1957); cert. den. 350 U.S. 847), we pointed out that the reason for duplicate tests is to

insure against the possibility of error having been made in the first laboratory test or clerical error in submitting reports. We stated in that case, "In some cases even three series of tests have been performed in order to insure the accuracy of the results. It is recognized by the Government agencies that it is enormously important to applicants in such cases as these that the tests be accurately performed and reported" (p. 353).

Counsel claims that Dr. Neiman was informed at the time of the second tests that these were duplicate tests and that the first tests, performed three years previously, had shown that respondent was not the son of the alleged parents. The record shows that Dr. Neiman testified (Oct. 3, 1960) that when he tested respondent on August 12, 1960, he did *not know* that it was the same case. He stated that the technicians were different, and he was not aware that this was a recheck until he received a communication from the Immigration Service informing him that this was a repetition. He testified that the findings on August 12, 1960, were identical with the findings on February 18, 1957.

Counsel's brief refers to *Matter of L—*, 8—259 (B.I.A., Feb. 19, 1959), wherein the expert witness testified that the child was excluded by the Rh tests, but that the "A–B–O and M–N tests . . . provide no information as to the question of parentage." Counsel implies that there is an inconsistency between this testimony and the testimony of Dr. Neiman in the instant case. Dr. Neiman states that he found an exclusion on the A–B–O and M–N tests but says, "I am not referring to the Rh because that is not significant." The quote from *Matter of L—, supra,* is from Dr. Alexander Weiner's certification and is one sentence lifted out of context from an eleven-page decision involving a blood-testing situation much more complex than the case now before us. In prior decisions we have discussed the medical literature on this subject. Each of the blood systems (and new ones are becoming known) is independent of the other. An example that might be used is that the blood systems are similar to independent solar systems, coexisting simultaneously and each independent of the others.[1] All pathologists who

---

[1] "Medicolegal Application for Blood Grouping Tests," Report of the Committee of the Am. Med. Assn., 1952 (exh. 6, herein), says, "To date, more than eight independent blood group systems have been identified." In *Criminal Law Review*, Autumn 1956, Vol. 3, No. 1, "Application of Blood Tests in Criminal Cases," Dr. Alexander Weiner refers to the use of all known practical tests, including the "f" and "p" systems and gives an example of a person with O, MN, $Rh_1Rh_1$, f, p. He states that the chance of another person having this identical blood would be about 1 in 300, whereas if only the A–B–O test was used, the chance of coincidence in the population could be as high as 40%. He says that in tests on fresh human blood more than 50,000 types of blood can be distinguished.

have testified in the cases that have come to the Board agree, and all medical evidence we have been able to discover establishes, that an exclusion of paternity may be shown by the tests in routine medicolegal use relating to any one of the three blood systems. Incompatibility of blood may be demonstrated by any one of the tests, or by all of the tests. It is conceivable that the blood of a child could be so carefully matched to that of the alleged parents that the lack of parentage, and thus the fraud, might not be discoverable by any of these methods. Obviously, such blood matching would be difficult. There is no inconsistency between the certification of Dr. Weiner in *Matter of L—*, 8—259, and the testimony of Dr. Neiman here. The cases are different.

Our decision is bound by the blood-test results. In the past six years we have held in decisions concerning approximately fifty-five separate persons that blood-test evidence is conclusive when it is satisfactorily established that the tests have been conducted by competent and experienced persons, and where the tests establish the impossibility of the claimed relationship. *Matter of L—F—F—*, 5—149 (1953); *Matter of W—K—S— and W—P—S—*, 5—232 (1953); *Matter of D—W—O— and D—W—H—*, 5—351, 356 (1953, 1954); *Matter of L—C—S—*, 6—212 (1954). *In Matter of L—*, 8—259, we cited a number of court decisions sustaining the findings of the Board in these cases and accepting the conclusiveness of properly conducted blood tests. In addition to the decisions set forth in *Matter of L—*, *supra* (which we will not repeat here), there are three new decisions, as follows: *Lew Moon Cheung v. Rogers*, 272 F. 2d 354 (C.A. 9, 1959); *Wong Kwok Sui v. Boyd*, 285 F.2d 572 (C.A. 9, 1960) (cited above), sustaining our unreported decision in *Matter of W—K—S—*, A-8895043 (May 18, 1959); *Wong Yoke Sing v. Dulles*. 151 F. Supp. 459 (D.C. N.Y., 1957). These cases hold that blood-grouping tests, when they establish that a claimant to citizenship is not the child of the alleged parents, constitute clear, unequivocal and convincing evidence that warrants disregard of prior decisions admitting him as a United States citizen.

In *Lew Moon Cheung v. Rogers*, *supra*, the court admitted the reports of blood tests made at United States Public Health Service clinics under 28 U.S.C. 1732 as records made in the regular course of business at the time of or shortly after the occurrence of the event. The court stated that it was part of the regular course of business, and was within the inherent nature of the business of the San Pedro Clinic, to make blood tests for other Government agencies who request such tests. *Wong Kwok Sui v. Boyd*, *supra*, held that the original admission of the appellant into the United States as a citizen did not constitute an estoppel against the Government, and that the blood-test evidence "would pass as a prepon-

derance, as clear, cogent and convincing, or as beyond a reasonable doubt." The court continued:

Sui's main point goes to the adequacy of the evidence and involves the qualifications of one Dr. Vio in Hong Kong to take a sample of Fung's blood in Hong Kong and to classify it. [At the hearing, the significance of the Hong Kong tests were testified to by a Dr. Kratz of the United States Public Health Service. It was he who found the incompatibility. Dr. Vio did not testify as to the significance of the three blood types found in the alleged father, mother and son.] We have examined the depositions and are satisfied his competence was adequately established. We rest our appraisal on the record, and not upon what is not there. However, when we have done that, we feel better about our decision when we know that Sui did nothing on his part to get proof that Fung's blood type was not as Dr. Vio found it and did nothing to contradict expertly the Government's evidence as to the significance of the types.

The fact that Sui's blood was compatible with Quong's, the alleged father's (a citizen), does not raise a presumption that he was the son of Quong when Sui claims he was the son of Quong and Fung, where an impossible compatibility of the three blood types exists. At this point in the sequence, we hold the burden then shifted to Sui. At least as a minimum, Sui would have the problem of finding another mother.

Sui asserts the evidence on the blood testing is conflicting. If so, we might reverse, but we do not find it so. [Our decision is in accord with *Lew Moon Cheung* v. *Rogers*, 9 Cir., 272 F.2d 354. And this court regards its results herein as wholly consistent with *Lee Kum Hoy* v. *Murff*, 355 U.S. 169.]

We have quoted at length from the Circuit Court's decision in *Wong Kwok Sui* v. *Boyd, supra*, because it does not, as yet, appear to be reported, and it is entirely applicable to the set of facts now before us.

It is no coincidence that respondent lived with the alleged parents in Seattle for only a few weeks or a month after his arrival in the United States in 1947. Respondent and his alleged parents testified that following their arrival in Seattle they lived in very cramped quarters and soon sent respondent, a boy of 10, to live with his "godmother" in Chicago. The alleged father and mother both testified that they did not know this woman except as "J—S—"; that she is unrelated to them; that they have never seen her; and they have never seen respondent since he left them in the early part of 1948. The alleged father testified (Apr. 2, 1957) that his wife's mother made the arrangements for the boy to go to Chicago and that he has paid no support money to J—S— for his son. The alleged mother also testified (Dec. 14, 1956, Seattle) that J—S— was a friend of her mother's; that it was through her mother's recommendation that their first son went to Chicago to live; and that the boy has never been back to Seattle.

The godmother, J—S—, testified (Aug. 12, 1957) that she met the alleged mother in China when L—S—H—C— was a girl of eight or nine, that she had *seen* L—S—H—C—'s mother in China but *had*

290

*never talked with her* and was not a close friend. The alleged god-mother testified further that negotiations as to respondent were carried on between herself and the alleged mother by phone; that she did not make the arrangements to take respondent through the grandmother in China; that she does not even know where the grandmother lives.

Respondent could answer no questions regarding the family of his alleged father and mother, their brothers and sisters. He said he answered these questions when he came into the United States but since he had not seen his father and mother in 13 years he has forgotten the answers by now.

It should be noted, also, that at the time respondent was born on July 18, 1938, the alleged father would have been 16 years of age, and the alleged mother was not yet 16. The alleged father's claimed birth date is April 8, 1922; the alleged mother's claimed birth date is October 27, 1922. They claim to have been married in February 1937. The alleged father testified (Seattle, Apr. 2, 1957) that they were married in a church but he could not remember whether there were other people in the church, whether there were one or two, or fifty, or one hundred people in the church. He could not remember the name or location of the church or whether any of his or his wife's relatives were present. The alleged mother testified that there were ten people present at her marriage, and no relative of hers nor of her husband.

On December 14, 1956, L—S—H—C—, the alleged mother, testified that respondent lived with them in Seattle, following their entry, for one year. At all other times the alleged parents and the godmother testified that he lived in Seattle a few weeks or a month or two.

Under the circumstances of this case, even without the blood tests, it would be difficult to believe that respondent is the child of the alleged parents. They have had three children since they arrived in the United States, and all three children live with them in Seattle. The special inquiry officer did not discuss the discrepancies in the record because of the prior holding of this Board that blood tests demonstrating incompatibility of blood between a claimant and alleged parents constitute conclusive evidence of lack of relationship. We have mentioned the discrepancies and other suspicious elements in the record merely for makeweight, as we have done, also, in other cases involving blood-test evidence.

The blood tests in this case were performed by qualified technicians, and they were rechecked according to accepted laboratory procedures. The test results were interpreted by a pathologist whose qualifications were not challenged. His conclusions are consistent with all the medical evidence that has come to our attention. The

blood tests constitute clear and convincing evidence that respondent is not the son of the alleged parents. We recognize the misfortune of uprooting respondent, who has adapted well to life in the United States, but he is not a United States citizen and, under the law, was not entitled to admission as the son of a citizen.

The application for adjustment of status under section 245 of the Immigration and Nationality Act is not within the jurisdiction of the Board. Respondent at least should be given the opportunity to depart voluntarily which has been granted in other similar cases.

**ORDER:** It is ordered that the outstanding order of deportation be withdrawn and the alien be permitted to depart from the United States voluntarily without expense to the Government, to any country of his choice, within such period of time and under such conditions as the officer in charge of the district deems appropriate.

*It is further ordered* that if the alien does not depart from the United States in accordance with the foregoing, the order of deportation be reinstated and executed.